UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

SHAWNTA M. WHITESIDE,

                          Plaintiff,

              -vs-                                           12-CV-889-JTC

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]

                          Defendant.

---

APPEARANCES:        JAYA ANN SHURTLIFF, ESQ.
                                Law Offices of Kenneth Hiller
                                Amherst, New York
                                Attorneys for Plaintiff

                                WILLIAM J. HOCHUL, JR.
                                United States Attorney, Western District of New York
                                (MARY K. ROACH, AUSA, of Counsel)
                                United States Attorney's Office
                                Buffalo, New York
                                Attorneys for Defendant.

This matter has been transferred to the undersigned for all further proceedings, by order of Chief United States District Judge William M. Skretny dated November 14, 2013 (Item 12).

Plaintiff Shawnta M. Whiteside initiated this action pursuant to the Social Security Act, 42 U.S.C. § 405(g), to review the final determination of the Commissioner of Social

---

[1] At the time this action was filed, Michael J. Astrue was the Commissioner of Social Security, and was properly named in the complaint as the defendant under 42 U.S.C. § 405(g). On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security, and is hereby substituted as the defendant in this action, pursuant to § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office."), and Rule 25(d) of the Federal Rules of Civil Procedure. For continuity, the court will herein refer to Acting Commissioner Colvin as "Commissioner."

Security ("Commissioner") denying plaintiff's application for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits, as provided for in Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401, 1381 *et seq*. Both parties have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the following reasons, plaintiff's motion is denied, and the Commissioner's motion is granted.

## BACKGROUND

Plaintiff filed applications for SSDI and SSI benefits with the Social Security Administration ("SSA") on October 7, 2008, alleging disability due to neck, back, and leg injuries suffered in a car accident on September 16, 2007 (Tr. 79-85; Tr. 92-94).[2] These claims were administratively denied by the SSA on December 22, 2008 (Tr. 51-56). Plaintiff requested a hearing, which was conducted on October 12, 2010, by Administrative Law Judge ("ALJ") William M. Weir (Tr. 24-48). Plaintiff appeared at the hearing and testified, without representation.

On January 24, 2011, ALJ Weir issued a decision finding that plaintiff was not disabled within the meaning of the Social Security Act (Tr. 11-23). The ALJ determined that plaintiff "has status post motor vehicle accident with back, neck, and leg pain and objective evidence of cervical and lumbar disc disease," but that she did not have an impairment or combination of impairments that had significantly limited her ability to perform basic work-related activities for 12 consecutive months as required under the

---

[2]Parenthetical numeric references preceded by "Tr." are to pages of the administrative transcript filed by the Commissioner as part of the answer in this action (Item 6).

Social Security Act (Tr. 16). The ALJ's decision became the final decision of the Commissioner on July 27, 2012, when the Appeals Council denied plaintiff's request for review (Tr. 1-4).

Plaintiff filed this action on September 19, 2012, seeking judicial review of the Commissioner's determination pursuant to 42 U.S.C. § 405(g) (Item 1). The Commissioner filed an answer, along with the administrative transcript (Item 6), and the parties moved for judgment on the pleadings pursuant to Rule 12(c) (Items 7 & 8).

For the reasons that follow, plaintiff's motion is denied, and the Commissioner's motion is granted.

## DISCUSSION

**I.      Scope of Judicial Review**

The Social Security Act provides that, upon district court review of the Commissioner's decision, "[t]he findings of the Commissioner … as to any fact, if supported by substantial evidence, shall be conclusive …." 42 U.S.C. § 405(g). Substantial evidence is defined as evidence which "a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938), *quoted in Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Tejada v. Apfel*, 167 F.3d 770, 773-74 (2d Cir. 1999). The substantial evidence test applies not only to findings on basic evidentiary facts, but also to inferences and conclusions drawn from the facts. *Giannasca v. Astrue*, 2011 WL 4445141, at *3 (S.D.N.Y. Sept. 26, 2011) (citing *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)).

Under these standards, the scope of judicial review of the Commissioner's decision is limited, and the reviewing court may not try the case *de novo* or substitute its findings for those of the Commissioner. *Richardson*, 402 U.S. at 401; *see also Cage v. Comm'r of Soc. Servs.*, 692 F.3d 118, 122 (2d Cir. 2012). The court's inquiry is "whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached" by the Commissioner. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982), *quoted in Winkelsas v. Apfel*, 2000 WL 575513, at *2 (W.D.N.Y. February 14, 2000).

However, "[b]efore the insulation of the substantial evidence test comes into play, it must first be determined that the facts of a particular case have been evaluated in the light of correct legal standards." *Klofta v. Mathews*, 418 F. Supp. 1139, 1411 (E.D.Wis. 1976), *quoted in Sharbaugh v. Apfel*, 2000 WL 575632, at *2 (W.D.N.Y. March 20, 2000); *Nunez v. Astrue*, 2013 WL 3753421, at *6 (S.D.N.Y. July 17, 2013) (citing *Tejada*, 167 F.3d at 773). "Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations." *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (citations omitted). Thus, the Commissioner's determination cannot be upheld when it is based on an erroneous view of the law, or misapplication of the regulations, that disregards highly probative evidence. *See Grey v. Heckler*, 721 F.2d 41, 44 (2d Cir. 1983); *see also Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987) ("Failure to apply the correct legal standards is grounds for reversal."), *quoted in McKinzie v. Astrue*, 2010 WL 276740, at *6 (W.D.N.Y. Jan. 20, 2010).

If the Commissioner's findings are free of legal error and supported by substantial evidence, the court must uphold the decision. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied ... the court shall review only the question of conformity with [the] regulations…."); *see Kohler*, 546 F.3d at 265. "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). Even where there is substantial evidence in the record weighing against the Commissioner's findings, the determination will not be disturbed so long as substantial evidence also supports it. *See Marquez v. Colvin*, 2013 WL 5568718, at *7 (S.D.N.Y. Oct. 9, 2013) (citing *DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998) (upholding the Commissioner's decision where there was substantial evidence for both sides)).

**II.     Standard for Determining Eligibility for Disability Benefits**

To be eligible for SSDI or SSI benefits under the Social Security Act, plaintiff must show that she suffers from a medically determinable physical or mental impairment "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...," 42 U.S.C. § 423(d)(1)(A), and is "of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a). The Social Security regulations set forth a five-step process

to be followed when a disability claim comes before an ALJ for evaluation of the claimant's eligibility for benefits. *See* 20 C.F.R. §§ 404.1520, 416.920. First, the ALJ must determine whether the claimant is presently engaged in substantial gainful activity. If the claimant is not, the ALJ must decide if the claimant has a "severe" impairment, which is an impairment or combination of impairments that has lasted (or may be expected to last) for a continuous period of at least 12 months which "significantly limits [the claimant's] physical or mental ability to do basic work activities...." 20 C.F.R. §§ 404.1520(c), 416.920(c); *see also* 20 C.F.R. §§ 404.1509, 416.909 (duration requirement). If the claimant's impairment is severe and of qualifying duration, the ALJ then determines whether it meets or equals the criteria of an impairment found in the Listings. If the impairment meets or equals a listed impairment, the claimant will be found to be disabled. If the claimant does not have a listed impairment, the fourth step requires the ALJ to determine if, notwithstanding the impairment, the claimant has the residual functional capacity ("RFC") to performing his or her past relevant work. Finally, if the claimant is not capable of performing the past relevant work, the fifth step requires that the ALJ determine whether the claimant is capable of performing other work which exists in the national economy, considering the claimant's age, education, past work experience, and RFC. *See Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000); *Lynch v. Astrue*, 2008 WL 3413899, at *2 (W.D.N.Y. Aug. 8, 2008).

The claimant bears the burden of proof with respect to the first four steps of the analysis. If the claimant demonstrates an inability to perform past work, the burden shifts to the Commissioner to show that there exists other work in the national economy that the

claimant can perform. *Lynch*, 2008 WL 3413899, at *3 (citing *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999)).

In this case, as discussed above, ALJ Weir's written decision reflects his determination, based upon his review of the medical evidence and plaintiff's hearing testimony, that plaintiff did not meet her burden at the second step of the sequential evaluation process to show that she had an impairment or combination of impairments that significantly limited, or was expected to significantly limit, her ability to perform basic work activities for 12 consecutive months (Tr. 16-19). Accordingly, the ALJ found that plaintiff's "medically determinable impairments were not durationally severe" (Tr. 19), and consequently, that plaintiff was not under a disability as defined in the Social Security Act (*id.*).

In support of her motion for judgment on the pleadings, plaintiff contends that the ALJ committed legal error by concluding his analysis at step two of the sequential evaluation. According to plaintiff, Supreme Court and Second Circuit precedent holds that the step two "severity" analysis should be used only to screen out *de minimis* claims, and the evidence in the record establishes that the disabling effect of her medically determinable impairments is much more than *de minimis*. Plaintiff also contends that, given her unrepresented status at the hearing, the ALJ had a heightened duty to develop the record by recontacting plaintiff's treating physician to determine whether plaintiff's impairments met the duration requirement, and committed error by failing to do so.

## A.      Severity

The ALJ's determination of "severity" at step two of the sequential evaluation process is guided by the Social Security regulations as follows:

> At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509 [or § 416.909], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

To be medically determinable, an impairment:

> … must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms ….

20 C.F.R. §§ 404.1508, 416.908. To be severe, an impairment must "significantly limit [the claimant's] physical or mental ability to do basic work activities," which are "the abilities and aptitudes necessary to do most jobs," such as

(1)   Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
(2)   Capacities for seeing, hearing, and speaking;
(3)   Understanding, carrying out, and remembering simple instructions;
(4)   Use of judgment;
(5)   Responding appropriately to supervision, co-workers and usual work situations; and
(6)   Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521, 416.921. In addition, the impairment or combination of impairments "must either last or be expected to last for a continuous period of at least 12 months" or be expected to result in death. 20 C.F.R. §§ 404.1509, 416.909.

As already indicated, the claimant bears the burden to present medical evidence establishing severity. *Flagg v. Colvin*, 2013 WL 4504454, at *7 (N.D.N.Y. Aug. 22, 2013) (citing 20 C.F.R. § 404.1512(a)). Although the Second Circuit has held that the ALJ's function at the second step of the sequential evaluation is limited to "screen[ing] out *de minimis* claims," *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (citing *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987)), the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, by itself, sufficient to render a condition "severe." *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995). "Indeed, a finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.' " *Flagg*, 2013 WL 4504454, at *7 (quoting *Rosario v. Apfel*, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19,1999)); *see also* Social Security Ruling ("SSR") 85–28, 1985 WL 56856 at *3 (S.S.A. 1985), *quoted in Bowen*, 482 U.S. at 154 n. 12 (1987).

In this case, the ALJ's written decision reflects a thorough consideration of the medical evidence, beginning with the medical records from Sisters of Charity Hospital emergency room where plaintiff was treated for complaints of back and neck pain on September 16, 2007, the day of the accident (Tr. 18, 152, 158, 161-62). Upon physical examination by emergency department medical personnel, plaintiff showed no evidence of trauma; range of motion testing produced pain on the right side the neck, and mid-and lower back (Tr. 161). She was given Toradol by injection, and Robaxin by mouth, for pain (Tr. 162). No x-rays were taken or other diagnostic studies performed at the time, and

plaintiff was discharged to home in improved condition, with diagnoses of myofascial cervical strain and myofascial lumbar strain (Tr. 152, 162). She was given prescriptions for 20 tablets of Anaprox DS and 15 tablets of Flexeril, instructed to follow-up with a primary care physician in two to three days, and given a one-day work release (Tr. 152, 162).

The ALJ also discussed the records from chiropractor Dr. Julius P. Horvath, D.C., noting that Dr. Horvath "is the only treating source who provided treatment to the claimant on a durational basis" (Tr. 18). The record reflects that Dr. Horvath saw plaintiff initially on September 24, 2007 (a week after the accident), and thereafter on several occasions through February 18, 2008 (Tr. 18, 226-29, 232-41, 252-56). On the date of plaintiff's initial visit, physical examination showed range of motion limitations in all areas of the cervical and lumbar spine, and positive findings on various orthopedic tests, but no motor or sensory deficits (Tr. 227). Based on this initial examination, Dr. Horvath indicated that plaintiff was temporarily totally incapacitated from September 16, 2007, until further notice (Tr. 226). In a form dated September 27, 2007, Dr. Horvath "tentatively" indicated that plaintiff would be able to perform her usual work by November 12, 2007 (Tr. 225). This return to work date was extended on several occasions (*see* Tr. 204, 213, 242-43, 260-65). On February 1, 2008, Dr. Horvath completed a Disability Certificate form indicating that plaintiff was temporarily totally disabled from September 16, 2007, to March 9, 2009, and that "a date of return is scheduled for 03/10/08" (Tr. 243), and on February 11, 2008, Dr. Horvath completed a "No Fault" insurance form on which he indicated that, while the duration of plaintiff's future treatment "may exceed one year," she "should be able to return to work" on March 10, 2008 (Tr. 257).

ALJ Weir also reviewed the records of Dr. Tahir M. Qazi, M.D., a neurologist and pain management specialist, who saw plaintiff at EMG Spine & Sports Medicine on October 9, 2007, upon referral from Dr. Horvath (Tr. 196). Dr. Qazi noted plaintiff's complaints of constant, fluctuating, dull neck and back pain that had not gone away with chiropractic treatment. Plaintiff reported that the pain radiated to her shoulders, arms, mid back region, and lower extremities, causing tingling in both hands, poor sleep, difficulty in movement, and compromised activity. On physical examination, Dr. Qazi noted that plaintiff was obese, weighing 250 pounds. Musculoskeletal examination showed tight muscles in the cervical and thoracolumbar region with mild to moderate tenderness on palpation, but otherwise showed normal functional range of motion, normal functional strength, normal vibration and proprioception testing, symmetrical deep tendon reflexes, and stable gait. Dr. Qazi diagnosed myofascial pain with a mild degree of spasm. He prescribed Lortab, Mobic, Baclofen, Ambien, and Colace, and recommended that plaintiff exercise and maintain her level of activity as much as possible (Tr. 196).

The ALJ also considered the results of CT scans of plaintiff's lumbar and cervical spine, performed at Northtowns Imaging on November 6, 2007 (Tr. 18, 200-02). Reviewing physician Philip A. Baum, M.D., reported that the CT scan of plaintiff's lumbar spine showed small to mild central disc protrusion at L5-S1 abutting and slightly displacing the traversing proximal S1 nerve root sheath/nerve roots; minimal to mild degenerative changes elsewhere, most marked with mild multilevel facet arthropathy and ligamentous hypertrophy without other mass effect or displaced neural structure noted; and minor multilevel retrolisthesis and minor scoliosis which in part may be positional or spasm (Tr. 200). The cervical spine CT scan showed minor multilevel cervical spondylosis with no

focal disc protrusion and no mass effect or displaced neural structure, and a possible abnormality at C7-T1 (Tr. 201). Dr. Baum noted that his evaluation of the CT scan results was compromised by motion, and he recommended a magnetic resonance imaging (MRI) study for further evaluation (Tr. 201).

On November 21, 2007, Dr. Sean A. Higgins, D.C., performed an independent chiropractic examination of plaintiff (Tr. 206-09). Plaintiff reported her history of cervical spine pain, thoracolumbar pain and bilateral shoulder pain following the accident on September 16, 2007. She stated that she began chiropractic treatment with Dr. Horvath approximately one week after the accident, and continued on a treatment schedule of three times a week, but was uncertain if the chiropractic treatment was helping. She reported that, at the time of her visit with Dr. Higgins, she wore a cervical collar four hours per day. She did not perform any rehabilitative exercises (Tr. 206). She complained of daily occipital headaches; intermittent cervical spine pain and muscle spasms, or "jerking;" daily pain across her upper back that radiated to her lower back; right arm pain, mainly in the elbow and shoulder regions; and daily, intermittent numbness in the third, fourth, and fifth fingertips (Tr. 207). Upon reviewing plaintiff's CT results and performing a physical examination, Dr. Higgins reported "positive objective examination findings" which could respond to additional chiropractic treatment and gentle home-based stretching exercises. In his opinion, plaintiff had not reached pre-accident status, and could not currently return to any form of work (Tr. 209).

Plaintiff was seen again by Dr. Qazi on November 28, 2007. She reported that her symptoms continued, and that she was walking for exercise as advised. Her weight was reported at 285 pounds. Upon physical examination, Dr. Qazi noted that plaintiff's range

of motion in her neck and trunk was within functional range. Palpation revealed slightly tight muscles in the cervical and thoracolumbar region with a mild degree of tenderness. Plaintiff also reported altered pinprick sensation in her fingertips. The physical examination otherwise showed no significant changes from Dr. Qazi's findings on his prior examination showing functional range of motion, functional strength, normal vibration and proprioception testing, symmetrical deep tendon reflexes, and stable gait (Tr. 195; see Tr. 196).

On January 10, 2008, plaintiff had a CT scan of her thoracic spine which showed "minor degenerative changes and scoliosis," and "mild right-sided neural foramina narrowing at T8-T9 possibly slightly displacing the exiting right T8 roots" (Tr. 202).

ALJ Weir also discussed the report of Dr. Samuel Alderman, M.D., who performed a consultative internal medicine examination of plaintiff on December 11, 2008 (15 months after the accident), at the Commissioner's request (Tr. 18, 278-81).[3] Plaintiff reported that she still suffered "total spine pain" which was constant, sharp, and marked in intensity. She was currently taking Baclofen, Ambien, and Proventil as needed, which provided partial relief. She lived with her teenage son, and was able to cook, clean, do laundry, and bathe and dress herself. She enjoyed television, radio, and reading (Tr. 278). On physical examination, Dr. Balderman reported plaintiff's height as 5'7" and weight as 270 pounds.

---

[3] The record contains no reports of medical treatment between February 18, 2008 (plaintiff's last chiropractic treatment with Dr. Horvath), and December 11, 2008 (the consultative examination by Dr. Balderman). In his decision (see Tr. 18), ALJ Weir referred to a note from the Pain Rehab of Western New York office of Dr. Romath Waghmarae indicating that Plaintiff rescheduled her appointments on March 5 and April 30, 2008; did not show up for her appointments on May 30 and July 30, 2008; and was not rescheduled for another appointment due to "repeated no shows" (Tr. 275). Plaintiff testified at her hearing that she did not attend these appointments because her insurance ran out, and also stated that after her chiropractic or physical therapy visits she "wouldn't be able to get out [of] bed for weeks," and that it "didn't make any sense . . . of why to go" if it was not making her better (Tr. 38-39).

She was in no acute distress, and walked on heels and toes without difficulty at a normal gait. Squat was 20% of full, but Dr. Balderman noted that plaintiff's effort was "incomplete" (Tr. 279). Musculoskeletal examination showed cervical spine range of motion of 10 degrees in flexion, 10 degrees in extension, and 15 degrees in rotation, and lumbar spine flexion was to 60 degrees, but Dr. Balderman again noted plaintiff's "incomplete" or "poor" effort (Tr. 279-80). Plaintiff elevated her right shoulder to 120 degrees, and her left shoulder to 90 degrees. She had full range of motion of elbows, forearms, wrists, hips, knees, and ankles bilaterally. All other results of musculoskeletal, neurologic, extremity, and fine motor activity examinations were reported within normal limits. Dr. Balderman's diagnosis was "[t]otal spine pain with symptom magnification" and "minimal physical limitations," and the prognosis was "stable" (Tr. 280).

In reaching his determination that plaintiff did not have an impairment or combination of impairments that significantly limited her ability to perform basic work activities for a period of 12 consecutive months, the ALJ indicated that he "gave more weight to the findings [and] opinion of Dr. Balderman, who is a medical doctor," than he gave to the opinion of Dr. Horvath, a chiropractor (Tr. 19). This was not error. As this court has recognized, because the Social Security regulations do not classify chiropractors as either physicians or "other acceptable medical sources," the Commissioner is not required to accord their opinions the same weight as accorded to the opinions of physicians, including consultative examiners. *See, e.g., Corson v. Astrue*, 601 F. Supp. 2d 515, 531-32 (W.D.N.Y. 2009) (opinion of Dr. Horvath not entitled to same weight os opinions of medical doctors); *Banks v. Astrue*, ___F. Supp. 2d ___, 2013 WL 3288305, at *9

(W.D.N.Y. June 28, 2013) (consultative physician's opinion may constitute substantial evidence in support of ALJ's determination).

Furthermore, this court's review of the record as a whole reveals no substantial inconsistency between Dr. Balderman's opinion that, as of December 11, 2008, plaintiff had "minimal physical limitations," and Dr. Horvath's opinion rendered on February 11, 2008, indicating that plaintiff would be able to return to work on March 10, 2008. Likewise, Dr. Balderman's findings are also largely consistent with the findings of Dr. Qazi, who examined plaintiff on October 9, 2007, and November 28, 2007, much closer in time to the date of onset, indicating that plaintiff had a functional range of motion, functional strength, symmetric deep tendon reflexes, and a stable gait (*see* Tr. 195-96).

Accordingly, it was within the ALJ's discretion to weigh the evidence in the record and to rely on the medical opinion of Dr. Balderman as support for his determination that plaintiff did not have an impairment or combination of impairments that significantly limited, or was expected to significantly limit, her ability to perform basic work activities for 12 consecutive months. Based on this analysis, and upon review of the record as a whole, the court finds that the ALJ did not commit legal error by concluding his analysis at step two of the sequential evaluation, and that there is substantial evidence in the record to support his determination that plaintiff's impairments, considered alone or in combination, are not "durationally severe."

## B.   Duty to Develop the Record

Plaintiff also contends that the ALJ committed legal error by failing to recontact plaintiff's treating physician, Dr. Qazi, to obtain his opinion as to whether plaintiff's

-15-

impairments were expected to limit her ability to perform basic work activity for a period of more than one year.  In this regard, the Second Circuit has long recognized the proposition that, "where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel … ."  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (internal quotation marks omitted); *see Atkinson v. Barnhart*, 87 F. App'x 766, 768 (2d Cir. 2004) (duty to develop record is "heightened when a claimant proceeds *pro se*").  This duty "includes assembling the claimant's complete medical history and recontacting the claimant's treating physician if the information received from the treating physician or other medical source is inadequate to determine whether the claimant is disabled …," as well as "advising the plaintiff of the importance of such evidence."  *Batista v. Barnhart*, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004).  On the "flip-side" of this same proposition, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  *Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011) (internal quotation marks omitted).

   Plaintiff does not point to, nor does the court find, any deficiencies or obvious gaps in the administrative record that might have triggered the ALJ's duty to recontact Dr. Qazi, Dr. Horvath, or any of plaintiff's other treating sources for their opinions on the durational severity of plaintiff's impairments.  Significantly, as discussed above, Dr. Qazi saw plaintiff only twice, and his assessments as to the degree of plaintiff's myofascial pain and functional limitations, made within two months of the accident, contain no information that

could reasonably be considered as inconsistent with the ALJ's severity determination. *Cf. Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (physician who only examined the claimant once or twice had not developed the kind of treatment relationship that would entitle the physician's opinion "to the extra weight of that of a 'treating physician' "). Moreover, there is no decipherable information in the additional evidence submitted to the Appeals Council by plaintiff's counsel in May 2011 (Tr. 298-302), or in counsel's February 11, 2012 letter brief (Tr. 146-50), which could reasonably be construed in any manner to contradict the ALJ's decision regarding the durational severity of plaintiff's impairments, or that would have required the ALJ (or the Appeals Council) to recontact any treating source for explanation or supplementation.

Accordingly, the court finds that the ALJ did not commit legal error by failing to recontact Dr. Qazi or any of plaintiff's treating sources, or to otherwise discharge his "heightened" duty to develop the record. To the contrary, the record presented to the ALJ, considered as a whole, contains substantial evidence to support his finding that plaintiff did not have an impairment or combination of impairments that significantly limited her ability to perform basic work activities for at least 12 consecutive months, and plaintiff has failed to identify any additional evidence or information that might have changed the ALJ's decision.

Because the ALJ's decision rests on adequate findings supported by substantial evidence in the record, and in the absence of legal error causing the ALJ to disregard any identified probative evidence, "[the court] will not substitute [its] judgment for that of the Commissioner." *Veino*, 312 F.3d at 586.

**CONCLUSION**

For the foregoing reasons, plaintiff's motion for judgment on the pleadings (Item 7) is denied, the Commissioner's motion (Item 8) is granted, and the case is dismissed.

The Clerk of the Court is directed to enter judgment in favor of the Commissioner, and close the case.

So ordered.

\s\ John T. Curtin
JOHN T. CURTIN
United States District Judge

Dated:   2/12/ 2014
p:\pending\2012\12-897.ssa.jan23.2014